See, there's a court reporter here. However, no one asked my permission or informed me in advance. I have no problem with it, but that is the protocol in our court. Turning to the first case, In re, BLM versus, I'm not going to read all the names, Elliot Sagar et al versus Irving Picard and SIPC. Thank you. Is anyone going to take the podium? May it please the Court, Your Honor. My name is Peter Partee from Hunt and Williams LLP, and I'm here on behalf of appellants, certain of the appellants in this case, Patricia DeLuca, Edward Zrake, Nancy Zrake, and Karen Rich. I'll simply refer to them, in my argument, as the appellants, even though they are only certain of the appellants in this case. Your Honor, the appellants were the owners of a Madoff brokerage account with an approximate value of $954,000 as of the date the Madoff bankruptcy was commenced. $954 million? $954,000, excuse me, Your Honor. $954,000. These are individuals. Was that money deposited or money that Mr. Madoff et al said was in there? The SIPA trustee in this case contends that they were purely fictitious profits. That hasn't been fully adjudicated, but that is the contention of the SIPA trustee and the basis on which the SIPA trustee disregarded the inter-account transfer of those funds to the appellant's account, which also was established at the Madoff brokerage. And that is essentially the question before the Court, is the propriety of the methodology that the SIPA trustee has used to evaluate inter-account transfers. By that, we mean a transfer from one customer's Madoff brokerage account to another customer's Madoff brokerage account by virtue of a book entry transfer on the books and records of the brokerage firm. What would you have had them do? Your Honor, we submit that because Congress expressly incorporated the Bankruptcy Code's avoidance provisions into SIPA, that that is the appropriate methodology, that is the appropriate filter, the congressionally mandated one, to evaluate bona fide transfers, whether it's an inter-account transfer from one account to another or to a third party. They have to be put through that filter, and then either they're avoided, in which case they can be disregarded, or they have to be honored in accordance with state law. That is the dilemma. There wasn't an official avoidance? There was not at all, Your Honor. In fact, the trustee contends that it does not have to avoid the transactions in order to disregard them. Aren't we talking about money that doesn't exist? Your Honor, that is the contention, but there cannot be denied that there was a bona fide transfer from one account to the other. This is not, for example, the sort of transactions that were at issue before this Court in its prior net equity decision. In that case, they were purely fictitious securities transactions, one that they were demonstrably fictitious. Isn't that what you're asking for, those fictitious profits? Not at all, Your Honor. What we're asking for is for a bona fide transfer to be evaluated like any other, to be put through the congressionally mandated filter of avoidance actions. But doesn't the trustee have the duty to determine net equity under SIPA? And doesn't that duty supersede the bankruptcy title, the ordinary provisions of the bankruptcy code? Your Honor, I don't think it's credible to argue that Congress incorporated the bankruptcy code's avoidance provisions, but then would allow the trustee, by virtue of the exercise of its discretion, to obtain substantially the same result without going through that process, without according the recipients of a transfer the defenses and the process that the avoidance actions process provides. But this is a situation, as we found in the net equity decision, in which the books and records of BLMIS are totally unreliable and have no reflection on reality. But, Your Honor, these are very different, Your Honor. And that's exactly my point, is that the transfers at issue here were bona fide transfers. They did actually occur in the appellant's case. Transfers of what? Transfers of the rights that comprise the account. Which were the rights to stuff made up and for which there is no bona fide records. We don't know that. And, again, Your Honor, these are bona fide transfers. This is from a made-off account for one person to a made-off account for another person. Correct. Including fictitious profits. Possibly. But, Your Honor, these were— We've already pretty much said there are fictitious profits out there. They certainly are out there. They haven't been adjudicated on a case-by-case basis. We're simply evaluating the methodology for treating inter-account transfers. And what the trustee is asking for is a very special rule to treat inter-account transfers differently from transfers to third parties. And there's no reasonable basis for doing so. Under the bankruptcy code, inter-account book entry transfers are treated every bit as much like a bona fide transfer as any other. What do we know? Made-off accounts, it seems to me. Well, Your Honor, that would be establishing a special rule for inter-account transfers. We've already talked about the lack of any support for what is actually in those what I will call made-off accounts. Every single person who got screwed by that guy has a claim for a lot of money that he said was in there, and it turns out to be, unfortunately for them, only what they contributed at best, which usually ended up in somebody else's account if those other people were smart enough or fortunate enough to take it out. Well, Your Honor, that's exactly the arbitrariness of the trustee's rule, is had the appellants in my case simply withdrawn the funds as they were entitled to do, the trustee's sole recourse would have been to seek to avoid those transactions. Solely because of the happenstance that they chose to deposit those accounts back in a separately created made-off account, the trustee seeks to disregard the congressionally mandated framework for treating bona fide transfers, either avoiding them or honoring them. But you want us to say that they're bona fide even though there may be nothing that got transferred. I'm simply suggesting, Your Honor, that because they were bona fide transfers, they were not fictitious transactions. The mother did pass away. She did have a will. She did bequeath these accounts, the cash in her account, to her children. There were book entry transfers made. There was a new account established. Your contention, and Judge Carney here, is it your contention, in fact, that the fact that there was a bona fide transfer, that is that the mother died and there was a will transmitting material from one account to another, that that, in essence, imbued it with a reality that other accounts didn't have? It certainly did, Your Honor. It doesn't mean that they're unavoidable. It doesn't mean that. Why would that be? Well, Your Honor, because the securities transactions that the trustee is able to disregard under the net equity decision were purely fictitious. They were imaginations. The notations were concocted numbers. Because he said he bought certain things. Exactly. Here, these transactions actually have a concrete reality. They did, in fact, occur. Now, that doesn't mean that they're valid. The same paper that was fictitious that was transferred. And once it was – if we believe that this should be subject to bankruptcy avoidance, won't they be bound by the net equity decision as well? Your Honor, if you submit it to the avoidance action analysis, because it's a bona fide transfer, that's our contention. Our fundamental contention is that if it's a transfer, then you have to put it through the avoidance action analysis. My question is, if we agreed with you, wouldn't – it would still be bound by the net equity decision? Well, the net equity decision is – what it would be bound by is the rich jurisprudence that was incorporated into SIPA when it incorporated the bankruptcy codes avoidance provisions. There are – and that includes all sorts of defenses and time limitations, Your Honor. And that is the essence of the debate here today, is that many of the inter-account transfers at issue that this trustee seeks to disregard would be time barred under an avoidance action analysis, or there would be other defenses. The trustee seeks to have this court – Is there any time bar that applies to the net equity determination that the trustee is called on to make under SIPA? Your Honor, not that I'm aware of. But there is – if it's a transfer, we're contending a different framework ought to apply rather than a customized rule for inter-account transfers that the trustee wants to use in order to circumvent the limitations that are imposed by an avoidance action analysis. And with regard to transfer, you're relying really on the avoidance provision, the bankruptcy code, as opposed to our net equity decision and how it viewed the books and records in this very unusual case. Yes, Your Honor. The net equity decision applied exclusively to securities transactions. Those transactions are fundamentally different than the ones at issue here. One could go to the securities market and obtain objective corroboration that those transactions did not occur. Here, it makes no semantic sense to contend that a book entry transfer of cash didn't occur. It wasn't cash. Your Honor, it was a transfer that occurred by virtue of the notation on the books and records. It makes no semantic sense. Books and records don't support your view that these fictitious profits were cash that was transferred. It does support that there was a transfer. It's almost like an Ipse Dixit. When one does a book entry transfer of cash, that is all that is necessary. All and everything that's necessary. The necessary and sufficient conditions – These books were corked. The books weren't reliable. It makes no semantic sense, Your Honor, to say that with respect to a book entry transfer which occurs by virtue of the notation on the books and records. One can argue that it should be reversed. One can argue that it should be avoided. But one can't deny that it didn't occur. Based on the fact that these were transfers, Your Honor, bona fide transfers, we submit that they should be submitted to an avoidance action analysis with all the process and limitations and defenses that that entails. So we ask that the court reverse the district court's approval of the SIPA trustees' analysis of inter-account transfers and put them through the congressionally mandated filter of avoidance, and if they survive that process, honoring them in accordance with state law and disregarding them only if they do not survive that analysis. Thank you. Thank you, counsel. Thank you. I see you've readjusted the allotment of time, which is fine. And, Ms. Chapman, it looks like you're only having a minute on your first— And then two on rebuttal, if I may, Your Honor. Thank you so much. If I may, in the net equity decision, what the court was dealing with was the last statement because the trustee was determining each customer's net equity claim based on the last statement, which is what SIPA requires. The November 30, 2008, last statement showed ownership of securities. Madoff's records proved that he didn't own the securities listed on the statements as of November 30, 2008. And based on that fact, this court held that the trustee could use his net investment methodology. We know from his counsel that at the time he argued the net equity decision, he intended to seek to apply it to inter-account transfers, but that was not disclosed either to the customers or to the court. And this is the very first time in SIPA's history, since 1970, with its hundreds and hundreds of cases, many of them involving Ponzi schemes, this is the first time in SIPA's history it has ever taken the position that it can avoid an inter-account transfer of cash. This is not controlled by the net equity decision. It wasn't a transfer of cash. There was no cash. There was cash. There absolutely was cash. In fact... And you're entitled to whatever cash survives the net equity analysis. Or put another way, the only cash was the cash that was put in, but on the books, what was called cash was cash, plus all of this garbage which Madoff said was in there, which we have said wasn't there, and your co-counsel or your companion here, you know, very well put it, that you could go back and see that there were no stocks. But that came over as a cash transfer, but there was no substance to large parts of it. What was cash that came over was cash that was recognized, or is recognized, at least as I read what the bankruptcy court did and the district court. If I may, Your Honor, I think this is the problem with that argument. Cash is fungible. I'm not arguing, but you are, so please. Yes, you're right. Cash is fungible. So there's no way to tell whether the day before any of the transfers at issue was made, it was a transfer of cash. There's no way to tell whether the day before that transfer of cash was issued, Madoff didn't get a $2 billion investment from a new hedge fund. So it wasn't cash. I do know that now. I'm sorry? I do know that now because of the bankruptcy, because of the Madoff bankruptcy. We know he didn't get an infusion of cash. He went into bankruptcy in 2008. Correct. The trustee has claimed that the fraud started in 1980. Mr. Madoff and his chief lieutenant, Mr. Frank DePiscali, have both testified that the fraud began after 1992 with a particular strategy, the split-strike conversion strategy. So if there were transfers before 1992, when the evidence shows that there was no fraud, what is the basis for disallowing cash transfers that were made to third parties? These were not the transferor's accounts. They were transferred into a different account. So you're visiting the sins of the father, in a sense, on the son. These were transfers. They could have been equitable distribution, property settlements, which the Court of Appeals has held cannot be upset. They could have been transfers for consideration. They could have been gifts on which estate taxes were paid. It could have been any one of a number of things if that money had been transferred. It wasn't that the stocks were liquidated in order to raise the cash. This was cash in the transferor's account. If that money had been transferred to an account at J.P. Morgan Chase, there would have been no basis to avoid it. All right. You only asked for one minute. Thank you. I over-exceeded. Thank you. Elliot Sager, appearing pro se. May it please the Court, I'm Elliot Sager. I'm representing myself. The Court told me this button was to raise the platform. I hope it's a reset button because I'm not requesting any garbage. And it was not in my notes that I was screwed, but I like Judge Hall's commentary. I and my family were screwed. I waited for retirement. I didn't take out a penny. And my case differs materially from the other appeals the Court heard this morning. I am a net loser in the amount of $175,000, well under SIPC's limits. I never withdrew a penny of the cash investment I made in my law firm's account, yet SIPC refuses to reimburse my principal. Based upon what I've asked the Court and the bankruptcy judge, I don't even have to have an inter-account transfer. In 2008, all I asked was how much did I put in and how much did I take out. Mr. Sager, hi, this is Judge Carney. Don't you need to address whether you're a customer? Because I think SIPC has a mandate to equitably deal with the claims of customers. And as I understand it, you yourself, though you participated in a group that was a customer, you yourself were not a customer, and the other people in your group withdrew money. So maybe you could address that, please. Sure. Let me address that immediately. The customer status is as of when Madoff is bankrupt in 2008. I am incontrovertibly a customer as of that time. There is nothing in the jurisprudence that suggests I have to be a customer of the transferor account. That is a red herring in this case. That is not supported by the Cruz decision. Cruz only says that if I am a feeder fund investor, I have no claim under SIPA. Who disagrees with that? It does not support the inter-account transfer analysis. Moreover, the suggestion that the SIPIC trustee and SIPA made to Judge Engelmeyer that I had to be a customer is bogus because under Morgan Kennedy, which this Court has ruled upon, if there were a customer of a net winner account and a net loser customer, you do not get any special treatment. It just seems a fallacy to suggest that somehow I have to be a customer of the transferor account. What trumps all that, forgive me, is that under the Donnell v. Cowell case and Judge Rakoff's antecedent debt decision, the transferee from a transferor even always gets back his or her principal. That is my principal argument. You always get back your principal. That is all I am asking for here. I put in $175,000, and SIPIC, for the 40 years that it has been in existence, has always honored the claim of an under-the-limits net loser. By anyone's definition, I am a net loser. Nobody can controvert that. I hope, Judge Carney, I have answered your question. Forgive me, I get a little emotional. I have only lived with 11 years of this or nine, but who is counting? It is a terrible situation, and that is what we are dealing with, is a lot of people who lost a lot. All of the people involved have and deserve great sympathy. Nonetheless, we have a trustee who is trying to deal equitably and in accordance with the law with many competing claims. He has technical obligations, as you know, of course, that he needs to meet. I am trying to understand exactly what is wrong with the notion that one had to be a customer of the transferor account, which you concede you are not, in order to recover here. I am just not entirely sure what the answer is. You have said that you yourself put in an amount of money that you would like to be able to retrieve and that you are a net loser, but I am not entirely sure how that fits in with how the transferor analysis has been going, because I see that that analysis is dictated by our net equity decision. Maybe you could just spell it out for me. First of all, I seek nothing greater than what I am entitled to. In fact, the decision below makes me into the lowest class person possible. There are net winners, net losers, and a Sager class. Forgive me, I was in the Navy. I know all about different classes. The Sager class net loser, who is a incontrovertible net loser but hasn't received back SIPA protection, that's what SIPA is there for. It asks that general question, what did you put in it and what did you take out? So let's go to the net equity decision, which Judge Carney has asked about. The undergirding of the net equity decision is that it favors net losers. I am a net loser. It says, how do you approximate net equity? In my case, it's easy. In 2008, when you look at the situation, when all the dust settles, what did this customer put in and what did they take out? You saw that from the trustee's determination letter. What did you put in and what did you take out? As a matter of fact, you did not need to be a customer, which Judge Bernstein was told, of the transfer account if the transfer account were a net loser. Even if you were a net loser, SIPA, in its grace, and they were right, would treat a transferee of a net loser account who was not a customer of that account, they would give him the net equity that was in the account. All I'm asking for and all that Judge Rakoff says is always, under Donnell v. Cow, which is in this circuit, which is in every circuit, the law of Ponzi schemes, which says validly nobody can transfer anything in a Ponzi scheme, but you always get back. You always get back your net, your investment. That's all I'm asking for. At least you have a claim for it. Sir? Or at least you have a claim for that full amount. Sir, Judge Hall, I will get nothing. No, no, no. I don't . . . The reason, just so you help me remember the facts or make sure I've got them right, is because you invested through an account that was part of your law firm's investment, and then money got taken out of that account, and that is why the trustee is saying there was nothing that got transferred over because the cash got taken out. That's a new definition of Ponzi profits. It always used to be that Ponzi profits were in addition to what you put in. Now they're saying my principal is even a Ponzi profit. I received a cash confirmation from Madoff in February. I said to myself, gee, I'm now FDIC. I'm sorry. I'm now SIPC insured. Gee, at least I have $500,000 of insurance. I'm not asking for that. I'm only asking for the amount of my cash in. That's what I did long before the net equity decision. I only asked for my cash in, and I'm absolutely entitled to it. This affirmance, if you affirm the decision, there is going to be a new class of loser here, someone who is a net loser that nobody disagrees with in the amount of $175,000, which should be funded by the SIPC fund. It doesn't take away from anyone. My cash is as good as anyone else's cash. SIPC gave me back what I took out from a Merrill Lynch account stupidly, what did I know, and put it in Madoff. They gave that back to me. Of course, they try to say sign a waiver before I'll give it back, but that's another story. In any event, I am absolutely entitled as a net loser to my cash in, and Judge Engelmeyer and Judge Bernstein decided something on a fallacy. It was suggested, Judge Carney, in all due respect, that I had to be a customer of the transfer account, and somehow that would help me. They knew that I could never be a transfer of the transfer account, and even if I were, they are saying that somehow the SIPC could de-aggregate and treat my cash in somehow and give me credit for it. Well, if they have the ability to de-aggregate, which is suggested in our papers, reading it very carefully, they should give me that opportunity in this situation. Let me just ask a quick follow-up, please. Sure. So SIPC takes the position that you deposited the $175,000 into the pension plan. The money became the property of the pension plan, and the pension plan deposited it into the account, and it says that the pension plan has already recovered its principal and withdrawn fictitious profits at the time of the inter-account transfer. So you're saying that's irrelevant, that we ought to just look at the equities. You put in $175,000 of cash that ended up here, and SIPC ought to insure that amount. Is that right? Yes, Your Honor. Under the net equity decision, every single case deserves, that's what the court said, there are individual situations. The net equity decision prophesied that with fraud, there are many different commutations and permutations. In my case, there was one out of 593 people who is a net loser. And net losers, even if this principle works in every other case, I should be able to get my principal back. That has been what SIPC has done since 1970. There is never, in the history of SIPC, There is never a situation where a net loser under the limits of what SIPC is supposed to pay has never been, that has always been inviolate. You get back your principal. Thank you. You have reserved two minutes for rebuttal. We'll hear from the trustee. Good morning. May it please the court. Amy VanderWaal for Irving Picard, the Madoff trustee. Your Honors, the trustee's inter-account transfer method is consistent with the language and purpose of the Security Investor Protection Act and is a straightforward application of the net investment method approved by this court in its net equity decision. We know from that decision that we are to look to the unmanipulated portion of the books and records of BLMIS to determine net equity. In this case, the trustee has looked at the books and records with respect to the transfer or account to determine how much cash or principal existed in that account at the time of the transfer. So the problem with Mr. Seigor's claim is that when they look back at the cash that was in the transfer or account at the time that the transfer was made, some cash had already been taken out of it, and he's being tagged with that having been his cash. That's correct, Your Honor. Even though he didn't get it. That's correct. The net equity calculation occurs at the account level, with some exceptions, as this court outlined in the Cruz decision. But here, the pension fund was the customer. The pension fund withdrew over $30 million more than it invested. So at the time when Mr. Seigor tried to transfer from one account to the other, there was simply no principal left in the account transfer. The pension fund was a net winner. That's correct. And you're not attempting to claw that back? I'm not familiar with the avoidance action. There may be an avoidance action against the pension fund. I assume given the amount that they were a net winner that there is, but I don't know that for sure. And if that money comes back, does that readjust Mr. Seigor's, I'll call them rights or opportunity to get additional money back? That question sort of relates to the avoidance action provisions. The avoidance action provisions of the code are entirely separate from the net equity calculations under SIPA. There's no overlap between the two. We saw that in the net equity decision. We saw that in the 546E decision. Mr. Seigor's recourse is against the pension fund or the other beneficiaries. Unfortunately, his recourse is not against the fund of customer property because the fact that he later had an account in his name cannot create net equity where there is none. The money wasn't there. It's an unfortunate result, and the trustee is sympathetic, but the SIPA statute are not designed to recover all losses. What they do is create a priority customer fund estate, and the purpose is to return the principal to those who have lost it. So just to be sure I understand, this is Judge Carney. So you're saying even if a clawback action against the pension fund is successful, that that doesn't benefit Mr. Seigor, that the clawbacks and these proceedings are entirely separate. Is that right? Well, the money that is returned through the clawbacks form part of the customer property estate. So in order to share in those funds, you need to have a valid net equity claim against the customer property estate. And Mr. Seigor does have and has been paid on a valid claim for money he put into his own account that wasn't withdrawn. He did receive those funds, but with respect to the money that was attempted to be transferred from the net winner pension plan account, that money was not there. It didn't exist. So there's no net equity claim for those amounts. Okay. As I would like to turn now to the avoidance action argument that was made, I think as I alluded to, the two-year avoidance action statute of limitations simply doesn't apply to the calculation of net equity. In this instance, we have the circuits decision, we have the 546E decision, and we have a decision on antecedent debt from Judge Rakoff, all of which discuss netting over the life of the account. And Judge Rakoff, in his antecedent debt decision, specifically applies that to an inter-account transfer. And he found in that decision that there was no reason to pile fiction upon fiction when all of these records are internal BLMIS records. There's no reason to pile fiction upon fiction and try to manufacture net equity where it simply doesn't exist. And there's no reason why there should be a time limitation on that when what we're trying to determine here is an actual claim to the customer property fund. The appellate's approach is particularly untenable for a couple of reasons. Not only are they attempting to manufacture net equity where there is none, but they're also discriminating amongst customers. Those customers who received fictitious profit by way of an account transfer would get to maintain those profits, whereas customers who merely had fictitious profit applied to their account directly do not because of the operation of the net equity decision. But they also point out, this is Judge Carney, they also point out the apparent inequity of allowing those who made external transfers, who withdrew sums and placed it in another bank and then brought it back in as a separate account, to allow them to maintain amounts that they manufactured from false books, but not to allow the people who did the intra-account transfers. Can you speak to that concern? Of course. The issue here, and I think Judge Engelmeyer correctly recognized this, is that the trustee is bound by the books and records of BLMIS. That's what the books and records provision says, that you look, and in this case we look to the cash, the cash in and cash out as they appear in the BLMIS books and records. And because the money never left BLMIS, we can identify what portion of that is real and what portion of the transfer is not. Once the money leaves BLMIS, for better or worse, it's monetized and it's turned into actual physical money that goes out to another bank account. The trustee is limited to what appears in BLMIS's books and records, not the intrinsic records of customers. Although, of course, we're looking just at some of the numbers that appear in the books and records. We're discounting most of them. That's true. We're looking at the cash amounts in, the cash deposited by customers, and the cash withdrawals by customers, which amounts are accurate, which makes sense in a Ponzi scheme. If you want to keep your Ponzi scheme going, people know what they invest and they know what they take out. So, of course, it makes sense that those numbers would have to be accurate to keep it going. I think your adversary argues that an intra-account transfer is a different type of transaction than merely writing into an account false profits, and that that was kind of a break in the chain when his client, this is the first appellant, transferred inherited money from one account to another, and that that imbued the transaction with a sense of reality that the others didn't have. Do you disagree with that? I do disagree with that, Your Honor. Again, it's a simple transfer of fictitious profits. The money never left BLMIS. The books and records reflect that a transfer occurred, and when we look at the portion of the books and records that we know are reliable, we can figure out what that amount is and what should be credited to it. Any other approach does exactly what Judge Rakoff was afraid of, which is pile fiction upon fiction in this Ponzi scheme, where the trustee can use that portion of the books and records to unravel some of that fiction. That is the most equitable thing to do for the customer group as a whole. You heard Ms. Chapman argue that the books and records were reliable up to 1992. Did you rely on them? Your Honor, the issue raised by Ms. Chapman regarding the start of the fraud is not before this court. It's a question of fact that will be litigated in due course before the bankruptcy court. The trustee's position at the time when we were here on net equity and today is that at all relevant periods BLMIS was a fraud and no securities were actually traded. But again, that's a factual issue that will be litigated. Were real securities traded up until 1992? No, Your Honor. The books and records, again, this is— Mr. Madoff began his career? The relevant period for inter-account transfers begins in 1981. That's the period at which we begin applying the inter-account transfer method. And what the books and records of BLMIS indicate is that as of that time, trading was fictitious. But again, the factual issue regarding the start of the fraud is an issue that has come up in bankruptcy court and will be litigated—that factual issue will be litigated there. And you may see it in a couple of years, I assume. I had a further question. Oh, sorry. So I was—this inter-account transfer method seems closely tied to the net equity principle that was affirmed by our court in 2011. And I'm concerned that it wasn't presented at the same time as part of the overall method that was adopted that the trustee posed to adopt because we were trying to measure the relative merits of the two different methods that had been proposed. And I don't know whether the decision would have been different at all, but it certainly—this was an implication that wasn't considered by the net equity panel. And I wonder if you can explain why this wasn't presented as part of the method that the trustee was adopting. Yes, Your Honor. I believe that the reason is just that the trustee was sort of working from the biggest claims issues that affected everyone. Every customer was affected by the calculation of their net equity and sort of moving down from there. There was a subset of claimants who objected to the inter-account transfers, and we moved on to address that issue. If we had been wrong on the larger net equity issue, if the last statement method was the way to go, the inter-accounts transfer question would not have come up at all. It would not have needed to be addressed. So I think it was just trying to find an order in which to address the issues. So you don't see it as so intimately tied to the first decision that it couldn't be resolved differently? Or just that it was kind of a necessary ornament to the first discussion? I think the latter. I think it's such a straightforward application of the net equity decision that we weren't even sure at the time that it was going to be an issue. It just seemed like the logical corollary to that decision, that you follow the real money throughout BLMIS until it leaves that box. Do you have any sense of how many claimants are affected by the inter-account transfer issue we're presented with today as opposed to the number of claimants in the overall bankruptcy? I can tell you that there are approximately 400 objections filed in these proceedings that relate to inter-account transfers, and that affects, I believe, 660 claims. Those are the people who are participating. Overall, there are 16,000 customer claims that were filed. I see. Thank you. Thank you. Thank you. We'll hear from the intervener, SIPC. Good morning. May it please the Court, my name is Nathaniel Kelly, representing the Securities Investor Protection Corporation as statutory intervener in support of the trustees' inter-account method. Can you start by explaining why Mr. Sager could not get his $175,000 that he contributed back from SIPC? Yes, Your Honor. Mr. Sager, unfortunately, was not a customer of the retirement account. SIPC prioritizes the protection of customers, individuals or entities that have contributed their own money and have a special customer relationship with the debtor. In Mr. Sager's case, in the retirement account, he did not rise to that level of a customer. This Court has affirmed that principle in the Morgan Kennedy case and in Cruz, which is litigation related to Madoff. In that instance, it was a case of partners trying to obtain customer status when it was actually the partnership's account. When the account is held by a partnership, by an LLC, by a trust or by a retirement plan, those entities are the customer. And so the stakeholders do not rise to the level of the customers in those instances. Excuse me. So is that dictated by statute or is that a practice or you've cited case law? What's the source of authority for that method of treating the SIPC reimbursement plan or insurance plan as opposed to what Mr. Sager claims with it being undisputed, I gather, that he made a $175,000 contribution to that account? Your Honor, one key is that the trustee must determine the customer's net equity based upon the debtor's books and records. As far as the Madoff Ponzi scheme is concerned, the debtor's books and records show deposits by the retirement plan or show deposits by a partnership. They do not show deposits by Mr. Sager. So the debtor's books and records did not show that Mr. Sager had deposited $175,000 into BLMIS. It showed that at one instance the retirement plan had deposited funds and the retirement plan had withdrawn funds. I think Judge Carney was asking what is the source of only being able to reimburse customers. Is that from the statute? Yes, Your Honor. I'm trying to explain that the statute requires determination of customers' net equity based upon the books and records. And in the debtor's books and records, Mr. Sager did not make deposits into the retirement account. The retirement account made the deposits. Is the statute that defines the term customer? Yes, Your Honor. But where is that? The statute defines customer in, I believe it is Section 78, Section 15 U.S.C., Section 78 LLL, Subsection 2. And it requires the determination of a customer's net equity based upon a debtor's books and records in Section 78 FFF-2, Subsection B. So why are you relying on the books and records when we know the books were cooked? It's relying upon the only aspect of the books and records that we know to be accurate, which are the deposits and withdrawals. The retirement plan's books and records show that deposits were made by the retirement plan. It does not break it down based upon the individual stakeholders. And we heard from counsel that the pension plan withdrew $30 million, is that correct? I'm not sure of the exact number, but I believe so, Your Honor. But Mr. Sager would have a cause of action against the pension plan for a proportional return of his investment, wouldn't he? Yes, Your Honor. And in the cases where a pension plan or a partnership is a net loser and has received distributions from the fund of customer property, that property should then be distributed on a pro rata basis to the partners or to the individual stakeholders of the plan. Unfortunately, because the retirement plan was a net winner, that distribution of customer property was not made to the retirement plan. And do you agree with the counsel for the trustee that if a clawback action of some kind were successful against the pension plan, that that would not inure to the benefit of Mr. Sager in his attempts to recover? That any amount clawed back would just go into the general customer pool and would be distributed according to other principles? Yes, Your Honor, that's correct. Because any clawback would become part of the pool of customer property. And again, Mr. Sager is not a customer of the retirement plan. Are there any circumstances in which SIPC has allowed equitable claims by individuals with relationships with customers very close to the customer? Do you understand what I'm saying? Yes, Your Honor, and I am not aware of any of those situations. We have in the Madoff Ponzi scheme, as you said, we have the Cruz case, which has had to do with partners trying to obtain customer status, and there have been numerous decisions below by the bankruptcy court where the claims of these indirect claimants have been denied, and the trustee's determinations to deny have been upheld by the court. Has the SIPC made any payments to some of the net losers in this case? Yes, Your Honor, yes. For net losers who have a valid net equity claim, SIPC has advanced up to $500,000 per customer, and the trustee continues to distribute those advances as well as to distribute any funds that it has recovered. Thank you. Thank you. We'll turn to the rebuttal. Before I do that, I want to apologize for suggesting that I wasn't informed about the reporter. I was not informed, but an order was filed. Sometimes we don't know everything. Mr. Partee, you have one minute for rebuttal. Thank you, Your Honor. Congress incorporated the Bankruptcy Codes Avoidance Provisions into SIPA for a reason, and they did so with very special provisions to imbue the SIPA trustee with the ability to avoid transfers of customer property. It wasn't brokerage property. It's customer property, so they had a special provision to give a SIPA trustee special standing to avoid transfers that would have been customer property but for the fact that they were transferred. These are very special provisions. To any bankruptcy or insolvency practitioner, this is special stuff. It was incorporated for a reason. It should not be ignored simply because the trustee would ask for a custom rule to be created to enable it to disregard inter-account transfers on terms where it doesn't have to deal with the process and the defenses that an avoidance action would require. Thank you. Thank you. Ms. Chaitman, you asked for two minutes in rebuttal. What the trustee is asking for here goes a lot further than what the court ruled in the net equity decision because we're not dealing with the transferor's claim. We're dealing with the transferee's claim. It's a totally separate person or entity. In fact, under SIPA, there's a mandate that the customer property of a separate customer be deemed separate, and this is in the definition of net equity. Two different customers have different claims. Their claims cannot be confused or put together, and that's basically what the trustee has done here. The trustee is taking an equity deficiency that he found in the transferor account, and he's punishing the transferee for that, and that is expressly prohibited by the statute. So this goes way beyond what the net equity decision does. And I just want to point out that in this court's decision in the 546E case where the court affirmed the limitation on fraudulent transfer actions to two years from the date of the filing, the court recognized the sanctity of settlement payments, and this is a settlement payment. It's recognized under state law. It's recognized under federal securities law. It's recognized under SIPA. This is a transfer from one stranger, one separate account holder, to another separate account holder. That is a settlement payment which was recognized for years. Some of these transfers go back to the 1980s. And I think the court is taking the net equity decision way beyond anything that SIPA has ever asked for. SIPA has never taken this position before in any case. So I'd ask you to consider . . . and puts it into another Madoff account. Even though we know that there was no million dollars, at best it was $100,000 that had miraculously morphed ten times. Your position is . . . this is a question. I'll put it as a statement. Your position is that the transferee then has a claim for a million dollars. It has to be credited with that million dollars, yes. Because what you're doing is you're looking back in 2008 at a transfer that may have taken place in 1981. But that had no substance to it other than the $100,000 contribution, at least in my hypothetical. In your hypothetical, but it is a hypothetical because, as Mr. VanderWaal has pointed out, we are litigating the issue of when the fraud actually started. So if the court adopts the trustee's position here, what's going to happen? Under a statute which clearly was intended to promptly satisfy customer claims, promptly within months, here we are, it's 2017, Madoff confessed in 2008. We're going to have to litigate in every one of these cases when the money went into the transferor account because it could have been cash that was deposited in the transferor account the day before it went to the transferee account. And the only basis on which the trustee can say, well, the transferor account didn't have that million dollars in equity, is by saying, well, I'm going to look at the transferor account, and I see that over the last 25 years they've taken out more than they put in. Therefore, this new contribution of $1 million is simply going to cure a deficiency in the past. I don't believe that anyone in Congress intended for there to have to be a factual hearing with respect to every inter-account transfer. And it's easy enough to cut it off at the net equity level with the customer. But to take this extra step is a huge step, which I think the statute expressly prohibits. Thank you very much. Thank you, Counselor. Thank you. Mr. Sager? Let me begin by saying it turns out that the trustee and SIPC think you weren't a customer, and if there's any cause of action, it's from your pension plan, which took out a great deal of money. What's wrong with that? In 2008, when Madoff becomes bankrupt and goes into SIPC bankruptcy, I'm a customer of my own account. I'm not asking for the billion plus that is in my account. It's in your pension fund. No, no, Your Honor. That's my whole case. Please. In 2008, I had the Sager account. I've gotten lost in the shuffle in this case because of the main proponents. I have a little. You had your own SIPC account. Yes, I had my own SIPC account. Forgive me, Your Honor. And how much did you deposit in that account? I deposited $184,000. I got that back. But my account started. You got that back? Yes, yes. But I also deposited a cash transfer, I thought. I'm not asking for the amount of my cash transfer. All I've been asking for is, which I am entitled to as a transferee in a bankruptcy, the amount of my net equity. You know, if I took out in the two years prior to the Madoff bankruptcy, the $175,000 that I put in, they couldn't claw it back. Because under 548C of the bankruptcy code, Judge Rakoff has ruled, I have a good faith defense. And the trustee and Judge Rakoff have pointed out that what you're entitled to claim is the flip side of what they could not claw back. So Congress has indicated that someone who has put money in to the extent has a claim under SIPC. There's no basis for me to sue, and I won't sue law partner widows, for crying out loud, who did nothing, who were innocent transferees long before a statute of limitations. That's not realistic. And there is just revisionist history today to say that I didn't put in $175,000, my pension plan put it in. What difference does it make? I have K-1s from a reputable law firm that you saw in the record that show I put in $175,000. The difference is, is that you are not a customer. It doesn't matter. I'm a customer in 2008. I get something from my broker, Madoff, Elliot Sager, SIPC insured. It says, you hear the advertisements, you see it on television, insured up to $500,000. Doesn't that mean something, at least to the extent of my cash in? The Second Circuit opinion looks to me, it's special, at 240 of the record. But no party has contested the availability of advances under SIPC to cushion the impact of Madoff fraud. Why have they said that to people in the last statement method? Surely someone who is not asking for the last statement, the million plus that I thought was in my account and for my family for retirement, I didn't ask for that. I thought it was appropriate only to ask for my cash in. I have not sought other people's money. Just so I'm absolutely clear, Mr. Sager, is cash that you put into your pension plan at your law firm, that you then moved out of that and put into what I'll call your 2008? Yes, sir. And those are my K-1s, and that is not Madoff made up rosy profits. That's hard work as a lawyer. Something else that SIPC could do is basically, if they gave you credit for that cash, and they're looking to do a clawback, they could just add that to what they're trying to clawback because that money went elsewhere. Of course, Your Honor. I know you're not supposed to call it insurance, but back in Packer-Wilbur days, you were allowed to call it insurance. And when President Nixon set it up, it was supposed to be like the FDIC. The world thinks it's insurance. And I'm not saying that they have to protect all laws. If the market went down, so be it. I accept that, but at least don't add insult to injury. The cruelest cut of all in this case is that I've not only been screwed by Madoff, but to use Your Honor's words, I'm getting screwed by the, I'm about to say FDIC, I'm getting screwed by SIPC. They should acknowledge and have the grace to acknowledge that I put in $175,000, and all I'm asking in my case, they spent more on legal fees to thwart me on not a principal here. I deserve, as a customer in 2008, to get back my principal. Thank you, Your Honor. Thank you very much. Thank you all very much for a very interesting argument. We will reserve decision. I will ask the clerk to adjourn court. Thank you. Judge Carney? Thank you very much, Judge Pooler. Court is adjourned at recess.